

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KANDICE BRIDGES, §
§
Plaintiff, §
§
v. **ORIGINAL** §  CIVIL ACTION NO. 3:04-CV-495-B
§
JENKENS & GILCHRIST, §
A Professional Corporation §
§
Defendant. §

---

# DEFENDANT'S BRIEF IN SUPPORT OF
# ITS MOTION FOR SUMMARY JUDGMENT

---

Bryant S. McFall
Texas Bar No. 00784556
Alicia Sienne Voltmer
Texas Bar No. 00797605
OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, P.C.
700 Preston Commons
8117 Preston Road
Dallas, Texas 75225
Telephone: (214) 987-3800
Facsimile: (214) 987-3927

**ATTORNEYS FOR DEFENDANT**

## TABLE OF CONTENTS

I.      SUMMARY.........................................................................................1

II.     UNDISPUTED FACTS........................................................................4

        A.      Jenkens & Gilchrist Hires Plaintiff in its Dallas Office ERISA Practice Group....4

        B.      Plaintiff Falls into a Self-Described "FUNK" that Negatively Affects her
                Performance and Billable ...........................................................................7

        C.      Plaintiff's Pregnancy and Her Continuing Deterioration in Performance
                During her First Trimester.........................................................................7

        D.      The Three Days Leading Up to Plaintiff's Delivery:  She Rejects a Project from
                Mr. Cowart and Receives her Annual Performance Review.........................10

        E.      Plaintiff Negotiates Her Terms for a Return to the Firm on a Part-Time Basis...13

                1.      Her First Two Days Back---"I thought maybe it might actually work
                        out...".......................................................................................14

                2.      By Her Third Day Back, Plaintiff Decided she was "Done...............15

        F.      Three Months Later, Plaintiff Quits the Firm for a Better Paying Job with Deloitte
                Touche.....................................................................................................15

        G.      Plaintiff's Charge of Discrimination........................................................16

III.    SUMMARY JUDGMENT STANDARD...................................................16

IV.     ARGUMENTS AND AUTHORITIES.......................................................17

        A.      Each Employment Action Upon Which Plaintiff Bases her Pregnancy
                Discrimination Claim is Time-Barred........................................................17

                1.      Plaintiff's Claim that Coward Disbanded her Filing Team as a Result of
                        Pregnancy Discrimination is Time-Barred......................................18

                2.      Plaintiff's Claim of Premature Delivery as a Basis for Pregnancy
                        Discrimination is Time-Barred...................................................19

                3.      Plaintiff's Constructive Discharge Claim is Time-Barred..................19

        B.      Plaintiff Cannot Establish a Claim for Pregnancy Discrimination..................21

                1.      Plaintiff's Loss of the GUST Filing Team Leader Role....................22

2.      Plaintiff's Premature Delivery...................................................25

3.      Plaintiff's Constructive Discharge Claim........................................29

V.      CONCLUSION............................................................................35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AMTRAK v. Morgan*, 536 U.S. 101 (2002)..........................................................................18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).......................................................17

*Armstrong v. City of Dallas*, 997 F.2d 62 (5th Cir. 1993) .................................................17

*Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292 (5th Cir. 1994)................................30, 31

*Bernard v. Rooms to Go*, No. 3:03-CV-293-H, 2004 U.S. Dist. LEXIS 9508
   (N.D. Tex. May 26, 2004)............................................................................................18

*Brown v. Kinney Shoe Corp.*, 237 F.3d 556 (5th Cir.), *cert. denied*, 534 U.S. 817
   (2001)............................................................................................................................31

*Butler v. Wackenhut Corrections Corp.*, No. 6:01-CV-118-C, 2002 U.S. Dist.
   LEXIS 13809 (N.D. Tex. July 29, 2002).....................................................................19

*Caswell v. Fed. Express Corp.*, No. 3:00-CV-1757-L, 2002 U.S. Dist. LEXIS
   25017 (N.D. Tex. Dec. 31, 2002) ................................................................................18

*Clark v. Southwestern Bell Telephone Co.*, No. CA3:96-CV-2913-BC, 1998 U.S.
   Dist. LEXIS 7981 (N.D. Tex. May 27, 1998)..............................................................25

*Clark v. Wise County Sheriff's Dep't*, No. 4:03-CV-1003-A, 2004 U.S. Dist.
   LEXIS 10985 (N.D. Tex. May 20, 2004) .....................................................................34

*Coney v. Dallas Housing Auth.*, No. 3-01-CV-2337-L, 2003 U.S. Dist. LEXIS
   1803 (N.D. Tex. Feb. 7, 2003).....................................................................................21

*Craven v. Texas Dep't of Criminal Justice-Institutional Div.*, 151 F. Supp. 2d 757
   (N.D. Tex. 2001)...........................................................................................................23

*Devenport v. Plains Capital Corp.*, No. 5:03-CV-146-C, 2004 U.S. Dist. LEXIS
   24614 (N.D. Tex Dec. 4, 2004) .............................................................................22, 23

*Dollis v. Rubin*, 77 F.3d 777 (5th Cir. 1995) .....................................................................22

*Donaldson v. Burlington Indus., Inc.*, No. 03-51362, 2004 U.S. App. LEXIS
   18354 (5th Cir. Aug. 31, 2004)..........................................................................30, 33, 34

*Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555 (5th Cir. 2003) .................................34

*Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986)......................................................17

*Friou v. Phillips Petroleum Co.*, 948 F.2d 972 (5th Cir. 1991)..........................................17

*Gage v. Nat'l Util. Co./Nuco*, No. 4:00CV-1672-BE, 2001 U.S. Dist. LEXIS
18213 (N.D. Tex. Nov. 6, 2001)...................................................................................32

*Garza v. Fuston*, No. 3:01-CV-1233-N, 2003 U.S. Dist. LEXIS 17134 (N.D. Tex.
Sept. 29, 2003)..............................................................................................................32

*Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137
(5th Cir. 1996).................................................................................................................16

*Haley v. Alliance Compressor LLC*, 391 F.3d 644 (5th Cir. 2004).............................30, 35

*Harvill v. Westward Communications, LLC*, 311 F. Supp. 2d 573 (E.D. Tex.
2004).................................................................................................................................33

*Hockman v. Westward Communications, LLC*, No, 03-41620, 2004 U.S. App.
LEXIS 27066 (5th Cir. Dec. 22, 2004).........................................................................33

*Huckabay v. Moore*, 142 F.3d 233 (5th Cir. 1998)..............................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................17

*Mattern v. Eastman Kodak Co.*, 104 F.3d 702 (5th Cir.), *cert. denied*, 522 U.S.
932 (1997)........................................................................................................................22

*Miles v. GCC Asset Mgmt., Inc.*, No. 3:01-CV-0065-P, 2001 U.S. Dist. LEXIS
20829 (N.D. Tex. December 13, 2001) .........................................................................18

*Pegram v. Honeywell, Inc.*, 361 F.3d 272 (5th Cir. 2004)..................................................23

*Peterson v. City of Dallas*, No. 04-11034, 2005 U.S. App. LEXIS 3484 (5th Cir.
Feb. 28, 2005) ................................................................................................................23

*Ramirez v. City of San Antonio*, 312 F.3d 178 (5th Cir. 2002)..........................................18

*Reznick v. Associated Orthopedics & Sports Med., P.A.*, No. 03-41497, 2004 U.S.
App. LEXIS 14318 (5th Cir. July 13, 2004)................................................................34

*Robinson v. Waste Mgmt. of Texas*, No. 04-40293, 2004 U.S. App. LEXIS 26808
(5th Cir. Dec. 23, 2004) ............................................................................................30, 35

*Stewart v. Dep't of Health and Hosp.*, No. 04-30409, 2004 U.S. App. LEXIS
24748,...............................................................................................................................34

iv

*Stith v. Perot System Corp.*, 2005 U.S. App. LEXIS 1489 (5th Cir. Jan. 31, 2005)..........20

*Stout v. Baxter Healthcare Corp.*, 282 F.3d 856 (5th Cir. 2002)......................................27

*Taylor v. Nickels & Dimes, Inc.*, No. 3:00-CV-1461-L, 2002 U.S. Dist. LEXIS
       14560 (N.D. Tex. Aug. 7, 2002) .................................................................................35

*Thompson v. Naphcare, Inc.*, No. 04-60028, 2004 U.S. App. LEXIS 23697 (5th
       Cir. Nov. 11, 2004) ......................................................................................25, 32, 35

*United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977) ......................................................19

*Urbano v. Continental Airlines, Inc.*, 138 F.3d 204 (5th Cir.), *cert. denied*, 525
       U.S. 1000 (1998)......................................................................................................22, 27

*Washington v. Patlis*, 868 F.2d 172 (5th Cir. 1989) ........................................................20

*Webb v. Cardiothoracic Surgery Assoc. of North Texas*, 139 F.3d 532 (5th Cir.
       1998) ...............................................................................................................................18

*Williamson v. Tom Thumb*, No. 3:01-CV-0159-BC, 2001 U.S. Dist. LEXIS 18811
       (N.D. Tex. Nov. 13, 2001) .......................................................................................23, 24

*Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295 (5th Cir. 2001) ...............................30

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982) .................................................18

## FEDERAL STATUTES

42 U.S.C. § 2000e-2(a)(1)...................................................................................................21

42 U.S.C. § 2000e-5(e)(1)...................................................................................................17

Fed. R. Civ. P. 56.............................................................................................................1, 16

42 U.S.C. § 2000e(k) ......................................................................................................3, 21

Pursuant to Fed. R. Civ. P. 56 and Local Rule CV-56, Defendant Jenkens & Gilchrist, a Professional Corporation ("Jenkens & Gilchrist" or the "Firm") submits the following Brief in Support of its Motion for Summary Judgment:

## I.

### SUMMARY

This is a pregnancy discrimination case wherein the sworn testimony of Plaintiff Kandice Bridges ("Plaintiff") establishes that each discrete employment action upon which her pregnancy claim is based is barred by the statute of limitations. And, even if her claim based on these acts is not time barred, she cannot establish a *prima facie* case for pregnancy discrimination, demonstrate that any act by Jenkens & Gilchrist was a pretext for pregnancy discrimination, or meet the high threshold for a constructive discharge claim.

Jenkens & Gilchrist is a full-service, national law firm with an office in Dallas, Texas. In 1999, Jenkens & Gilchrist hired Plaintiff as a full-time Associate attorney in the Dallas office ERISA practice group. Sometime in late 2001, Plaintiff fell into a self-described "funk," the direct result of which was a deterioration of her performance and a reduction in her billable hours. Despite several written commitments to the ERISA practice group leader, David Cowart, to improve, the funk continued well into July 2002.

Plaintiff became pregnant in March 2002 and announced the pregnancy to the Firm in May 2002. She contends that following her announcement, she was subjected to pregnancy discrimination in the form of comments by Riva Johnson, a shareholder (and mother) with whom she worked, and actions by Cowart in August and November 2002. In August 2002, Cowart disbanded one of four filing group teams he previously assigned her to lead whose purpose was to prepare GUST amendments to client benefits plans. She maintains this action was discriminatory and

calculated to harm her, even though she acknowledges her team had completed most of its work, Cowart assigned her and her team members to the remaining three teams led by senior attorneys, and these teams finished the amendments for the remaining plans.

She also claims events that occurred at work between November 5 and 7, 2002, evidence pregnancy discrimination and caused her to deliver her son prematurely. During this week, she notified Cowart and others that although her doctor had "put her to bed," she wanted to work from home for the remainder of the week and then begin her official paid maternity leave on Monday, November 11. She alleges Cowart then assigned her a project for another shareholder, which she initially accepted, and later made her feel like a "horrible person" when she returned the project. He and Johnson also presented Plaintiff with her annual performance review, which was poor, rather than waiting and giving it to her upon her return from maternity leave in February 2003. According to Plaintiff, these actions, combined with Johnson's prior comments, caused her to deliver her son prematurely.

Notwithstanding these pre-delivery events, during her maternity leave Plaintiff decided to return to the Firm on a part-time basis, and she negotiated with Cowart and Johnson a part-time schedule with a reduced billable-hour requirement, a potential bonus pay-out and a $100,000 salary. Unbeknownst to the Firm, Plaintiff's initial plan was to maintain this part-time arrangement only until she could secure other employment at a six-figure salary. After her return, however, Plaintiff believed the circumstances of her new employment arrangement were satisfactory for her to continue working for the Firm for the foreseeable future. This belief changed on her third day back when Cowart informed her by e-mail that he would not allow her to record or bill about five hours of time on a project because he was unhappy with her work product. This e-mail upset Plaintiff and prompted her to e-mail a response. When she complained to Johnson about the e-mail exchange,

2

Johnson suggested that Plaintiff's tone in the exchange was "snippy", nevertheless, Johnson attempted to resolve the dispute by informing Plaintiff she would not have to work with Cowart for the foreseeable future. Notwithstanding Johnson's actions, Plaintiff decided that day she was "done" at the Firm and could no longer work there; the Firm had forced her to quit and seek employment elsewhere. She was unwilling to leave, however, without securing a six-figure salary elsewhere. So, she continued working for the Firm until she obtained such a job, which was three months later.

Plaintiff alleges Jenkens & Gilchrist discriminated against her on the basis of pregnancy in violation of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (the "PDA") by: (1) disbanding her filing team in August 2002, which resulted her losing the team leader role; (2) taking actions in a three-day period that caused the premature delivery of her baby on November 8, 2002; and (3) by constructively discharging her employment on February 13, 2003, when she determined she could no longer work at the Firm regardless of what happened after that date. Jenkens & Gilchrist is entitled to judgment as a matter of law on these claims. First, Plaintiff did not file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) within 300 days of each alleged harmful employment action as required by law. Accordingly, each employment action about which she complains is barred by the statute of limitations. Second, her loss of the filing team leader role and the premature delivery of her son do not constitute adverse employment actions required to establish a pregnancy discrimination claim, and even if they were, she has no competent summary judgment evidence demonstrating they were the result of pregnancy discrimination. Finally, Plaintiff cannot prove the Firm constructively discharged her employment because she never experienced circumstances that would have forced a reasonable person to resign, never complained about any discriminatory treatment in accordance with Firm policy, negotiated a return to the Firm on a part-time basis, and then remained employed until she found a better paying job.

3

Jenkens & Gilchrist addresses each of these arguments in turn. The Firm's motion for summary judgment is based almost exclusively on Plaintiff's sworn deposition testimony, meaning no material facts are in dispute for purposes of this motion.

## II.

## UNDISPUTED FACTS

**A.    Jenkens & Gilchrist Hires Plaintiff in its Dallas Office ERISA Practice Group**

Plaintiff graduated from law school in 1997 and received a LLM degree in taxation shortly thereafter. App. at 46-48 (Bridges Depo. at 118, 119-20). In May 1999, Jenkens & Gilchrist hired Plaintiff as a Class of 1998 associate attorney in the Dallas office ERISA practice group. App. at 49-50 (Bridges Depo. at 122-23). During Plaintiff's employment, the Firm's performance review and bonus periods for associates ran from July 1 through June 30, the Firm's fiscal year. The Firm set and paid associate salaries on an annual calendar basis. App. at 59-60 (Bridges Depo. at 132-33).

Jenkens & Gilchrist provides new employees with an Employee Handbook (the "Handbook"). The Handbook includes the Firm's Anti-Harassment policy that provides, in relevant part:

> Jenkens & Gilchrist is committed to maintaining a work environment free from all forms of harassment, including, but not limited to, sexual harassment. Harassment undermines the morale and integrity of the firm and its employees. It is the firm's position that all employees and applicants have an unconditional right to work in an environment free from unwelcome harassment by co-workers, independent contractors, supervisory personnel, vendors and/or clients and their employees.

The policy contains a comprehensive mechanism for reporting harassment that identifies five possible individuals to whom a complaint must be reported. App. at 156-158, 194-95 (Bridges Depo. at 262-64). Plaintiff received a copy of the Firm's Handbook upon her hire, and attended subsequent

4

training on the harassment policy in March 2000.  App. at 156-57 (Bridges Depo. at 262-63).[1]

When Plaintiff started with the Firm, David Cowart was the ERISA practice group leader. The practice group workload was demanding, and associates typically worked eleven hours per day, and regularly worked six or seven days straight in a week.  App. at 54-57 (Bridges Depo. at 127-30). Cowart conducted mandatory, weekly practice group meetings, usually on Tuesdays, to assign projects, discuss changes in the law, and share information learned from outside meetings, such as those with the IRS.  App. at 60-62 (Bridges Depo. at 133-35).  Plaintiff perceived Cowart as a demanding supervisor who, in addition to his "very high" standards, expected more than the minimum from his associates.  Cowart emphasized billable hours to associates.  He did not pull punches when he challenged associates, did not hesitate to share criticism with associates about their work, and was intimidating in his mannerisms.  Plaintiff witnessed him criticize associates during the weekly practice group meetings.  App. at 62-64, 126-27 (Bridges Depo. at 135-37, 227-28).

Plaintiff performed well during her first two years at the Firm, when associates typically spend their time learning the ropes by drafting simple board resolutions or plan amendments, and conducting research projects.  She had no illusions regarding the increased expectations as she progressed from year to year, and was well aware that with each subsequent year of practice, she would have greater responsibility, the Firm's expectations of her performance would increase, and the bar by which she was measured would be set progressively higher.  App. at 57-59 (Bridges Depo. at 130-32).  During these first two years, Johnson offended Plaintiff, who is admittedly sensitive to criticism, by making comments to her about her clothes, hair color and appearance.  For example, Johnson once told Plaintiff she looked like an "orphan" because her blouse sleeves were too long,

---

[1] Jenkens & Gilchrist also had a Parental Leave Policy for attorneys, but Plaintiff does not recall reviewing the policy prior to her pregnancy.  App. at 38, 159-60 (Bridges Depo. at 94, 265-66).

she was "attractive but not beautiful" and that her hair color (at that time) "made her skin look pasty." App. at 67, 105, 199 (Bridges Depo. at 145, 203; Duarte Depo. at 56).

In 2001, and in response to various laws[2] that required employers to amend their benefit plans, Cowart created four filing teams with responsibility for amending and filing between 100-200 employee benefit plans. The team approach brought organization and structure to the amendment process, and Plaintiff was aware the sole purpose of the team was to address and amend plans for particular clients. App. at 80-81, 211 (Bridges Depo. at 175-76; Cowart Depo. at 146). Cowart asked Plaintiff, senior associate Turley, and shareholders Henry Talavera and Tom Hoffman to lead filing teams. Plaintiff was the least-experienced attorney to lead a team, trailing Turley in experience by several years. Plaintiff's team consisted of a first-year associate and a legal assistant. App. at 82-85 (Bridges Depo. at 177-80). The designation as a team leader was not a promotion; rather, it was simply part of an internal project by the ERISA practice group for the benefit of its clients. App. at 224 (*Cowart Decl.* ¶ 4). She did not receive a pay increase, change in job classification or enhanced employment benefits as a result of her team leader status. App. at 86 (Bridges Depo. at 181).

As a filing team leader, Plaintiff kept track of the employee benefit plans on her list, monitored the work performed by others on her team, and kept in touch with clients regarding information needed to prepare the plan amendments and the determination letter filing applications. Attorney team members had the same responsibilities; Plaintiff simply had the client contact and the final say as to the way the documents looked prior to presenting them to a more senior attorney for review. Otherwise, her job duties as an associate attorney remained the same. App. at 85-86 (Bridges Depo. at 180-81). To Plaintiff, the real "perk" of being a team leader was directing the activities of her team, having some client contact, and reviewing the work product before she

---

[2] Plaintiff refers to these laws collectively as the GUST Amendments. App. at 79-80 (Bridges Depo. at 174-75).

submitted it to another attorney for review.  Unlike Plaintiff, Talavera, Hoffman and Turley did not have their plans reviewed by someone prior to filing.  App. at 86-87 (Bridges Depo. at 181-82).[3]

## B.      Plaintiff Falls into a Self-Described "Funk" that Impacts her Performance and Billable Hours

Sometime in 2001, Plaintiff fell into what she describes as a "funk," which had a negative effect on her performance and billable hours.  This effect prompted Cowart to criticize her for her low billable hours and to express concerns about her performance. ("Q: So, is it fair to say that whatever was going on that put you in this funk, it was affecting your performance? A: Yes.  Q: And is it fair to say Mr. Cowart recognized it was affecting your performance? A: Yes.").  App. at 121-25, 204 (Bridges Depo at 222-26; Cowart Depo. at 76).  On September 10, 2001, Plaintiff sent Cowart an e-mail wherein she pledged to overcome her "funk."  App. at 121-25, 187 (Bridges Depo at 222-25).

On Saturday, February 9, 2002, Cowart confronted Plaintiff about her admittedly low billable hours for January.  By now, Plaintiff was "getting fed up" with Cowart confronting her about her low hours, so she sent him an e-mail telling him she did not want to have another billable-hours discussion with him.  App. at 125-26, 128, 188 (Bridges Depo. at 226-27, 229).  Cowart responded to Plaintiff's e-mail by explaining what he expected of her and by informing her it appeared she was doing the bare minimum to get by.  App. at 127-29, 188 (Bridges Depo. at 228-30).  She knew he was disappointed with her billable hours and performance.  App. at 128 (Bridges Depo. at 229).

## C.      Plaintiff's Pregnancy and Her Continuing Deterioration in Performance During her First Trimester

Plaintiff became pregnant sometime in March 2002, but did not disclose the pregnancy to Cowart and Johnson until May.  App. at 66, 69-70 (Bridges Depo. at 143, 155-56). Despite her

---

[3] Plaintiff admits this extra review step created more work and required more of her time.  App. at 87 (Bridges Depo. at 182).

7

September 2001 and February 2002 commitments to improve, her billable hours did not improve and her performance continued to deteriorate. Indeed, she candidly admits, "I know that my work product did suffer in my first trimester." App. at 160-61, 131 (Bridges Depo. at 266-67, 232). In May 2002, she confided to a friend in an e-mail that she was not putting in the hours she usually did. App. at 130-31, 189 (Bridges Depo. at 231-32). She e-mailed another friend that she "poop[ed] out around 4pm," and would leave work early. By her own admission, her pregnancy also affected her concentration and the hours she was at work. She was unable to concentrate because she was "obsessed" with looking at boy names on the internet. App. at 131-33, 190-91 (Bridges Depo. at 232-34). Her work simply was not of the quality it had been previously. App. at 175 (Bridges Depo. at 296).

On May 16, 2002, recognizing she was "in the hole 50-60 hours," Plaintiff sent an e-mail to Cowart and shared her "master plan" for making-up the hours and creating a cushion of hours before her maternity leave of absence, a plan she considered attainable. Ultimately, Plaintiff did not fulfill any of the billable hour goals she established for herself. App. at 134-36, 192 (Bridges Depo. at 235-37).

In May 2002, when Plaintiff, by her own admission, lacked concentration and was not working the hours she committed to work, Johnson told Plaintiff she did not believe Plaintiff should continue in her role as a filing team leader "because of the morning sickness and [Plaintiff's] amount of time [at the office]...work was going to fall through the cracks." App. at 100, 175 (Bridges Depo at 197, 296). Plaintiff talked to Cowart about Johnson's concern, and he confirmed it was *not* his plan to remove her as a filing team leader, and she remained a team leader until August 2002. App. at 92, 174-75 (Bridges Depo. at 187, 295-96).

Plaintiff's "funk" continued from Fall 2001 through July 2002.  Neither her performance nor her hours was "up to par" or what it had been in the past, and Cowart was receiving complaints from other shareholders about her performance.  App. at 131-32, 136-39, 168-69, 205-210 (Bridges Depo. at 232-33, 237-40, 288-89; Cowart Depo. at 108-13).

> Q:      [Y]ou've been in a funk, your performance hasn't been what its been in the past and your hours haven't been what they've been in the past.  Fair to say?
> A:      Yes.
> Q:      And that's from late, its Fall 2001 up to July 2002, that's true?
> A       Yes.

App. at 132-33 (Bridges Depo at 233-34).

In response to the performance issues, on July 23, 2002, Cowart met with Plaintiff and told her the quality of her work had fallen back to that of a second-year associate, and she could not continue to do the minimum and be successful at the Firm.  App. at 206-210 (Cowart Depo. at 109-113).

By August 2002, Plaintiff's filing team had finished all of the GUST Amendments for her team's individually designed plans, and her team had made a "significant dent" in its remaining plans.  The other teams had completed a good number of their plans as well.  Because there were fewer plans to amend, Cowart disbanded Plaintiff's filing team, which resulted in her loss of the team leader role, and divided the remaining work among the three existing teams led by more senior attorneys.  By doing so, Cowart removed the intermediate process of a review of Plaintiff's work before it was reviewed by a shareholder.  App. at 88-89, 94, 211-13 (Bridges Depo. at 183-184, 190; Cowart Depo. at 146-148).  Johnson had no input into Cowart's decision to disband Plaintiff's team.  App. at 222-23 (Johnson Depo. at 33-34).

Plaintiff's loss of the filing team leader role had no tangible impact on her job – she continued receiving the same pay, continued to work on the amendments with another team, remained classified as an associate and her partnership track was not affected.  App. at 91 (Bridges

Depo. at 186). Plaintiff did not file an EEOC charge of pregnancy discrimination within 300 days of this alleged "demotion." App. at 179-80 (Bridges Depo at 359-60).

**D.    The Three Days Leading Up to Plaintiff's Delivery: She Rejects a Project from Cowart and Receives her Annual Performance Review**

Prior to the practice group's weekly meeting on Tuesday, November 5, 2002, Plaintiff's doctor advised her that she needed to go on bed rest. She convinced the doctor to allow her to work one more week from home before beginning her maternity leave of absence on Monday, November 11. App. at 194-95, 108-109, 185-86 (Bridges Depo at 190-91, 207-08). During the November 5 meeting, Cowart assigned Plaintiff a project for another shareholder. The next day, November 6, 2002, Plaintiff sent Cowart an e-mail confirming she wanted to work from home for the remainder of the week and start her maternity leave the following Monday, November 11, 2002. App. at 109, 185-86 (Bridges Depo. at 208). Her objective in working from home was to defer the beginning of her official, three-month paid leave period as long as she could. App. at 172 (Bridges Depo. at 293). Although she committed to completing as many previously-assigned projects as possible while laying in bed that week, she told Cowart she was not comfortable taking any new projects, and she returned to him the project he assigned her the day before.[4] Cowart told her that by rejecting the project she was not putting the Firm first, her priorities were out of order, and she was putting the Firm in a bind. App. at 96, 108-110, 113-116 (Bridges Depo. at 192, 207-209, 213-16).

Associate reviews for fiscal year July 2001-June 2002 initially were scheduled to begin between September and October when attorneys completed the review forms, but reviews Firm-wide were delayed because the Firm was using new review forms. When Plaintiff notified Cowart she would be home on bed rest for several days before starting her maternity leave on November 11,

---

[4] At some point, Plaintiff contends Cowart spent 15 minutes telling her in front of a coworker "all the ways they could concoct for me to work laying at home." She does not recall if this conversation occurred on November 5 after the group meeting or on November 6. App at 112-13 (Bridges Depo at 212-13).

Cowart and Johnson decided to present Plaintiff with her annual performance review. They chose not to wait until her return from maternity leave in February 2003 because the raw data from the reviews would soon be available to the associates and they did not want Plaintiff to review the data before she received an explanation of the data. Likewise, because she was not going to advance with her class and receive a raise for 2003 – she was one of three associates who was not to advance with his or her class – they needed to notify her of the decision before she began receiving paychecks in 2003. Finally, they wanted her to have time to think about her performance issues while she was on leave, rather than confront her with them immediately upon her return. App. at 214-15, 217-18 (Cowart Depo. at 157-58, 178-79).

The content of Plaintiff's review forms completed by those shareholders and senior associates with whom she worked reflected the deterioration of her performance from the previous review period. The two people with whom she worked the most, John Kober and Erin Turley, were the most critical of her performance; indeed, Johnson's and Cowart's reviews were more favorable. Across the board, the reviews were consistent in the criticisms of Plaintiff's performance. The conclusion of the majority of the reviewers was that she was not performing at the level one would expect of an attorney with her years of experience.

Q:    The reviews uniformly are consistent about that you avoid analytical responsibility and your analysis is inconsistent. Is that a fair criticism or not, of your performance?
A:    I guess so. I don't know.
                              *   *   *   *   *
Q:    Do you think it was fair that the three people, the four people who said you were not ready to advance to the next level, that their conclusions were fair?
A:    I guess so.
Q:    Certainly it would be fair to say that reasonable minds could differ as to whether you were performing at a level one would expect of someone at your years of experience?
A:    Yes.

App. at 154-55 (Bridges Depo at 259-60). The average performance score Plaintiff received from

her reviewers was 2.93. Incredibly, Plaintiff scored herself an even lower 2.71 in the self-review she completed. App. at 139-40, 162, 152-53 (Bridges Depo at 240-41, 270, 257-58) (Q: How do you think your work during that review period [July 1, 2001 to June 30, 2002] compared to the work period that you've described as good in the previous years? Better, worse or the same? A: Worse).

Cowart and Johnson conducted Plaintiff's review on November 7, 2002.[5] App. at 116 (Bridges Depo. at 216). During the 45-minute meeting, Cowart and Johnson discussed the performance reviews completed by the reviewers and told her, among other things, she would be held back to the class of 1999, and that if her performance did not approve in the next year, she should expect an invitation to find another job. App. at 163-64, 168 (Bridges Depo. at 271, 273, 288). Following the meeting, Cowart visited her office and told her that although he did not mention it in the review, he felt Plaintiff was leaving the Firm in a lurch by declining the project she previously rejected. Later that evening, Plaintiff went into labor and delivered her son on Friday, November 8, 2002. App. at 165, 3, 112 (Bridges Depo. at 275, 30, 212).

Plaintiff contends that from the time of her pregnancy through June 2002, Johnson, herself a mother, made a number of offensive comments to her – comments she contends evidence pregnancy animus. Commenting on Plaintiff's maternity clothes, Johnson said they "looked like pajamas" and "she would never have been able to wear clothes like that to work, how casual they were, how vain [Plaintiff] was." App. at 65, 71-72, 102 (Bridges Depo. at 139, 160-61, 200). Further Johnson told Plaintiff her priorities were misplaced because of Plaintiff's commitment to perform in Bar None[6] and her failure to attend a client seminar. App. at 72-73, 176 (Bridges Depo. at 161-62, 351). ("Q:

---

[5] Plaintiff's claim that she received her review early is a bit misleading. Considering the review should have been conducted in September or October, it was, in fact, late. Plaintiff was simply the first in her practice group to receive her review. Her peers received their reviews shortly thereafter. App. at 224 (*Cowart Decl.* ¶ 5).

[6] Bar None is a song and dance production staged by local attorneys to raise scholarship money.

So then,…when you say "comments Ms. Johnson made about priorities misplaced," they were either about your participation in Bar None or the failure to go to this seminar? A: Yes"). Johnson made other comments that annoyed Plaintiff.

> A: When I was really sick, she would come into my office and see that I was nauseous and make comments like she was just happy to be nauseous when she was pregnant because it took her so long to be pregnant. I got pregnant so quickly that I should be thankful that I got pregnant quickly. Just things like that.
> Q: …why do you interpret that as a negative comment about pregnancy? Isn't she saying how lucky you are and how thankful you should be?
> A: It felt like an attack, not, "Wow, you should really be thankful that you are so lucky to get pregnant."
>
> *  *  *  *  *
>
> Q: It was [her] delivery not the content?
> A: Delivery, not – yes.

App. at 74-75, 73 (Bridges Depo at 163-64, 162). Plaintiff contends Johnson made other offensive comments, including several passing comments about Plaintiff's "enormous belly," one comment that Plaintiff's breasts were larger, and several comments that when Plaintiff walked it appeared she was "waddling." App. at 101-104 (Bridges Depo. at 199-202). Plaintiff subjectively believes the comments about her belly, maternity clothes, breast size and waddling evidence pregnancy animus simply because she cannot think of any other reason why Ms. Johnson would say them. App. at 107 (Bridges Depo. at 205). At no time did Plaintiff complain about Ms. Johnson's comments or conduct pursuant to the Firm's established reporting procedure. App. at 156-58, 175 (Bridges Depo at 262-64, 296).

E.    **Plaintiff Negotiates Her Terms for a Return to the Firm on a Part-Time Basis**

During her leave, Plaintiff decided she wanted to return to the Firm on a part-time basis, until she could find another job.[7] Her desire for a six-figure income motivated the decision to return, and

---

[7] In fact, as early as 2001, and through her pregnancy, Plaintiff continued her search for new employment. App. at 23, 68, 76-77 (Bridges Depo. at 60, 152, 171-72).

she confirms she would have returned full-time if she had been unable to negotiate a satisfactory part-time arrangement. App. at 4-5, 10, 11-13 (Bridges Depo. at 33-34, 40, 43-45).

On January 20, 2003, Plaintiff met with Johnson, Cowart, and Elaine Gress, a human resources employee, to discuss a possible part-time arrangement, including salary, billable-hour, and scheduling preferences. Plaintiff arrived at the meeting with a salary demand of $100,100 for 1650 hours[8], and three or four scheduling alternatives that would be acceptable to her. The parties discussed and agreed upon the terms of the part-time arrangement that were memorialized in a written agreement. App. at 13-16, 18-20 (Bridges Depo. at 45-48, 53-55). Before Plaintiff executed the agreement two weeks later, she confirmed with Gress in writing that under the new arrangement, she had the option to decline work, even though it was *not* common practice for associates in her section to decline work from other attorneys. No other attorney in the ERISA practice group had ever been allowed to work under this type of part-time arrangement. App. at 18-21, 181-83 (Bridges Depo. at 53-56). Plaintiff understood she was no longer on partnership track under her new arrangement. App. at 22 (Bridges Depo. at 57).

1.   *Her First Two Days Back---"I thought maybe it might actually work out..."*

Plaintiff returned to the Firm as a part-time associate on February 10, 2003. Notwithstanding her "horrible expectations," her first day "went as well as can be expected." Thus, despite the events of the past, she believed if every day was like her first day, she could remain employed at the Firm. App. at 5-7 (Bridges Depo. at 34-36) ("Q: So despite what had happened prior to your leave of absence, you could remain employed at Jenkens if the days were as they were that day? A: Yes. I

---

[8]  The 1650 billable hour requirement was reached by taking Plaintiff's full-time salary, dividing it by the number of hours she was required to bill for that salary, and then backing into the number of hours it would take to get to $100,000. At the time she made the reduced hour, part-time arrangement, she believed she could meet the monthly target to reach the 1650 billable hour goal. App. at 17 (Bridges Depo. at 50).

was trying to be an adult.").

     2.     *By Her Third Day Back, Plaintiff Decided she was "Done."*

On February 12, 2003, Cowart informed Plaintiff by e-mail that he was not going to allow her to record or bill four or five hours of her time on a client project.[9] She responded to him by e-mail and then forwarded the e-mails to Johnson. She later met with Johnson to complain about Cowart, who opined Plaintiff's "snippy tone" in her e-mail was partially to blame for the confrontation. Ms. Johnson attempted to resolve the matter, however, by telling Plaintiff she did not have to work on projects with Cowart for the foreseeable future. App. at 30 (Bridges Depo at 67). Unsatisfied, ***Plaintiff decided that day that she was "done" and could no longer work for the Firm, no matter what else happened from that point forward.*** App. at 8-9, 28-30 (Bridges Depo. at 38-39, 65-67). The date upon which she would actually separate her employment would be dictated by when she could find another job paying her $100,000 or more; nothing Jenkens & Gilchrist did would affect her decision to quit or the timing of her separation. App. at 24-27, 9 (Bridges Depo at 61-64, 39). ("Q: In other words, no matter what happened after that conversation (with Johnson), you had made up your mind you couldn't work at the firm anymore? A: Yes."). Incredibly, Plaintiff concedes none of these events of February 13, 2003 were motivated by pregnancy discrimination. App. at 43-44 (Bridges Depo. at 110-111).[10]

**F.**     **<u>Three Months Later, Plaintiff Quits for a Better Paying Job with Deloitte Touche</u>**

     In the weeks that followed her decision to quit, Plaintiff stepped-up her job search and

---

[9]  Cowart believed her work on the project was poor and of no value to the client. App at 224 (*Cowart Decl.* ¶ 6).

[10]  Plaintiff contends after she decided to quit and until her actual separation date, Johnson made negative comments about Plaintiff's parenting decisions and decisions regarding approaches to projects. Specifically, Plaintiff contends Johnson made several comments to her about her decision to breast-feed in lieu of using formula, her decision to pump breast milk at work, one comment that her breasts were large, comments directed at feeding her baby solids, and comments to the effect she should work on certain work projects when she was most alert. App. at 45-46 (Bridges Depo. at 117-18).

contacted an attorney for legal advice regarding a pregnancy discrimination claim against the Firm. App. at 31, 36, 50-54, 177-78 (Bridges Depo. at 68, 89, 123-27, 357-58). Plaintiff ultimately accepted the first job offer she received, a position as Employee Benefits Tax Manager with Deloitte and Touche paying her $110,000, and she submitted a resignation letter to the Firm on May 13, 2003. App. at 31-33, 34-35, 184 (Bridges Depo. at 68, 77, 80, 82-83).

Despite Plaintiff's belief that Cowart and Johnson were acting inappropriately toward her, Plaintiff *never* availed herself of the protections afforded by the Firm's anti-harassment policy during her full- or part-time employment. Plaintiff's only excuse for her failure to report the offending conduct was that she did not believe it would do any good to complain because Johnson was a member of the Firm's board of directors. App. at 156-58, 175 (Bridges Depo. at 262-264, 296).

**G.    Plaintiff's Charge of Discrimination**

Plaintiff dually filed a Charge of Discrimination with the EEOC and the Texas Commission on Human Rights (TCHR) on December 17, 2003 alleging sex and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended. December 17, 2003 is the first contact of any kind Plaintiff had with either agency. The EEOC issued Plaintiff a notice of right to sue that same day. App. at 179-80, 226-40 (Bridges Depo at 359-60; Plaintiff's Original Complaint and Jury Demand and attached copy of her EEOC Charge).

**III.**

**SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 mandates that summary judgment shall be granted when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To avoid summary judgment, a plaintiff must present evidence, not simply conjecture and speculation, *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d

137, 140 (5th Cir. 1996), and plaintiff must set forth specific facts showing there is a genuine issue

for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Assertions of ultimate facts without supporting specifics will not suffice to avoid summary

judgment. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986). Moreover, "[s]ummary

judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it

could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it

mandates judgment in favor of the movant." *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.

1993). In other words, "if the record, taken as a whole, could not lead a rational trier of fact to find

for the nonmoving party, there is no genuine issue for trial." *Friou v. Phillips Petroleum Co.*, 948

F.2d 972, 974 (5th Cir. 1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986)).

## IV.

## ARGUMENTS AND AUTHORITIES

**A.** **Each Employment Action Upon Which Plaintiff Bases her Pregnancy Discrimination Claim is Time-Barred**

Plaintiff contends the Firm discriminated against her on the basis of pregnancy resulting in

two harmful employment actions, the disbanding of her filing team in August 2002 and the early

delivery of her child in November 2002. App. at 39-40, 97-98 (Bridges Depo. at 96-97, 194-95).

Although she did not allege in deposition the alleged pregnancy animus resulted in her constructive

discharge or that it was even the reason she quit, such an allegation is contained in her Complaint, so

it is addressed herein.

A Title VII plaintiff in Texas must file a charge of discrimination within 300 days of learning

of the conduct alleged. 42 U.S.C. § 2000e-5(e)(1); *Huckabay v. Moore,* 142 F.3d 233, 238 (5th Cir.

1998). A plaintiff's claim accrues when she knows or reasonably should know the discriminatory act

has occurred. *Caswell v. Fed. Express Corp.*, No. 3:00-CV-1757-L, 2002 U.S. Dist. LEXIS 25017, at *26 (N.D. Tex. Dec. 31, 2002); *see also Ramirez v. City of San Antonio*, 312 F.3d 178, 181 (5th Cir. 2002) (An employee's claim accrues at the moment the employee believes , or has reason to believe, she is the victim of discrimination.). Discrete discriminatory acts are not actionable if they fall outside the time limit, even when they relate to acts alleged in a timely filed charge. *Bernard v. Rooms to Go*, No. 3:03-CV-293-H, 2004 U.S. Dist. LEXIS 9508, at *7 (N.D. Tex. May 26, 2004), (citing *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002)). Congress intended the limitations period contained in Section 2000e-5(e)(1) to serve as a statute of limitations. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393-94 (1982). A plaintiff may not maintain a cause of action under Title VII based on incidents occurring more than 300 days before the filing of a charge of discrimination with the EEOC. *Webb v. Cardiothoracic Surgery Assoc. of North Texas,* 139 F.3d 532, 538 (5th Cir. 1998).

Each of the employment actions about which Plaintiff complains is barred by the statute of limitations.

1.      *Plaintiff's Claim that Cowart Disbanded her Filing Team as a Result of Pregnancy Discrimination is Time-Barred*

On August 19, 2002, Cowart notified Plaintiff he was disbanding her filing team, which resulted in her loss of her team leader responsibilities. App. at 78-79, 90 (Bridges Depo. at 173-174, 185). It appears Plaintiff intends to argue this action was a demotion and, therefore, an ultimate employment action upon which she establishes a *prima facie* case of pregnancy discrimination. If it was a demotion, Plaintiff had 300 days from the alleged demotion, or until June 15, 2003, to file a timely charge of discrimination with the EEOC. *Miles v. GCC Asset Management, Inc.*, No. 3:01-CV-0065-P, 2001 U.S. Dist. LEXIS 20829, at *29 (N.D. Tex. December 13, 2001) ("The time for

counting the 300-day limitations period began to run from the time that Plaintiff knew or reasonably should have known that a discriminatory demotion had occurred."). Because it is undisputed Plaintiff filed her charge on December 17, 2003, Plaintiff's discrimination complaint regarding the filing team leader position is untimely and summary judgment is therefore proper. *Id.; see also Butler v. Wackenhut Corrections Corp.*, No. 6:01-CV-118-C, 2002 U.S. Dist. LEXIS 13809, at **16-18 (N.D. Tex. July 29, 2002) (claim relating to reduction in job responsibilities is time-barred if charge was filed more than 300 days after the reduction in responsibilities).

2.    *Plaintiff's Claim of Premature Delivery as a Basis for Pregnancy Discrimination is Time-Barred*

Plaintiff contends she delivered her baby prematurely on November 8, 2002 as a result of discriminatory comments by Johnson and discriminatory conduct by Cowart. Assuming, *arguendo*, their actions caused her early delivery, she had 300 days from the date of delivery, or until September 4, 2003, to file a charge of discrimination. Because she waited until December 17, 2003, or more than one year after the delivery, to file the charge, it is untimely. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis of a timely charge is the legal equivalent of a discriminatory act which occurred before [Title VII] was passed….[I]t is merely an unfortunate event in history, which has no present legal consequences.").

3.    *Plaintiff's Constructive Discharge Claim is Time-Barred*

To the extent Plaintiff claims Jenkens & Gilchrist's alleged pregnancy discrimination resulted in her constructive discharge, her claim is time-barred. It is undisputed that on February 12, 2003, Plaintiff decided she was "done," she could no longer work for the Firm, and nothing the Firm did or did not do after that date would affect her decision or the timing of her departure. Accordingly, it is this date upon which she was constructively discharged for limitations purposes, because the statute begins to run when the adverse action occurs (the date upon which she

19

determined she could no longer work at the firm) as opposed to the date on which she actually separated her employment. The Fifth Circuit's position on this point is unequivocal.

> "The operative date from which the [300-day period] begins to run is the date of notice of termination, rather than the final date of employment."... "[T]he relevant inquiry is when [the employer] may be considered to have 'established its official position and made that position apparent' to [the Plaintiff].... "If these acts were discriminatory, they were so immediately." Further, *"a discharge that is the delayed but inevitable consequence of an earlier decision is not a discrete act."*

*Stith v. Perot Sys. Corp.*, 2005 U.S. App. LEXIS 1489, *5-6 (5th Cir. Jan. 31, 2005) (citations omitted) (emphasis added).

Plaintiff testified repeatedly that as of February 12, 2003, she concluded she would not and could not continue to work at the Firm, regardless of what happened at work thereafter. A day after she made the decision, she shared her conclusion with a friend by e-mail, stepped-up her job search (sending multiple resumes that morning) and began looking for an attorney to represent her in a lawsuit against the firm. *See infra* pp. 15-16. Her later separation in May was thus the "inevitable consequence" of this earlier decision, which date was determined by when she located another six-figure job, not by the Firm's actions. In fact, Plaintiff concedes that had she not secured the Deloitte & Touche job, she would have continued working for the Firm indefinitely until she found a job that satisfied her financial demands. App. at 24, 27 (Bridges Depo. at 61, 64).[11] Because February 12, 2003 is the date on which Plaintiff was allegedly constructively discharged, she had 300 days from that date, or until December 8, 2003, to file a timely charge of discrimination. *See Stith,* 2005 U.S. App. LEXIS 1489, at *5-6; *Washington v. Patlis*, 868 F.2d 172, 175 (5th Cir. 1989). Plaintiff's

---

[11] As discussed *supra* pp. 13-16, because Plaintiff did not quit until 3 months after she was "done" and was unwilling to quit until she secured another high-paying position in which she was interested, she was not constructively discharged as a matter of law. Nevertheless, if she was constructively discharged, the law is clear that it occurred on the date she decided she could no longer work at the firm.

charge, dated December 17, 2003, was 8 days untimely and, therefore, summary judgment is mandated.

**B.**     **Plaintiff Cannot Establish a Claim for Pregnancy Discrimination**

Additionally and in the alternative, summary judgment is required because none of the actions about which Plaintiff complains establish pregnancy discrimination.

Title VII prohibits discrimination in employment against any person on the basis of her race, sex, national origin, color, or religion. 42 U.S.C. § 2000e-2(a)(1).  In 1978, Congress enacted the Pregnancy Discrimination Act (the "PDA"), which amended the definitional section of Title VII to proscribe discrimination on the basis of pregnancy and related medical conditions. The PDA provides, in relevant part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes...

42 U.S.C. § 2000e(k).  The PDA does not impose an affirmative duty on employers to accommodate pregnant employees, nor does it require an employer to provide special treatment for pregnant women.   To the contrary, it only requires that pregnant employees be treated the same for all employment-related purposes as other employees with respect to their ability or inability to work. *Coney v. Dallas Housing Auth.*, No. 3-01-CV-2337-L, 2003 U.S. Dist. LEXIS 1803, at *11 (N.D. Tex. Feb. 7, 2003).

In analyzing a claim for pregnancy discrimination, a district court applies the same rules used for discrimination claims in general.  *Id.* at *7.  To establish her *prima facie* case, Plaintiff must establish: (1) she was a member of a protected class; (2) she was qualified for the position lost; (3) she suffered an adverse employment action; and (4) other similarly situated were treated more

favorably. If Plaintiff establishes a *prima facie* case, the burden then shifts to Jenkens & Gilchrist to articulate a legitimate, non-discriminatory reason for its actions. If it does so, Plaintiff must then adduce sufficient evidence to permit a reasonable trier of fact to find pretext or intentional discrimination. *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir.), *cert. denied*, 525 U.S. 1000 (1998). A showing of pretext does not automatically entitle Plaintiff to judgment as a matter of law. Plaintiff must provide sufficient evidence to find the Jenkens & Gilchrist's justifications for its actions were false. The Firm is entitled to judgment as a matter of law on this ultimate question if the evidence, taken as a whole, would not allow a jury to infer the actual reason for its decisions was discriminatory. *Devenport v. Plains Capital Corp.*, No. 5:03-CV-146-C, 2004 U.S. Dist. LEXIS 24614, at **20-21 (N.D. Tex Dec. 4, 2004). Plaintiff cannot establish a *prima facie* case of pregnancy discrimination, nor can she establish pretext, based on the three acts about which she complains.

        1.    *Plaintiff's Loss of the GUST Filing Team Leader Role*

Plaintiff cannot establish a *prima facie* case for pregnancy discrimination based on the disbanding of her GUST filing team and concomitant loss of the team leader role because it is not an adverse employment action. The purpose of Title VII is to remedy ultimate employment decisions, not to challenge every interim action taken by an employer that may have a tangential effect on an ultimate decision. *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995). In this Circuit, only "ultimate employment decisions" qualify as adverse employment actions necessary to establish a *prima facie* case of discrimination. Ultimate employment decisions include hiring, granting leave, discharging, promoting, and compensation. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.), *cert. denied*, 522 U.S. 932 (1997).

By her own admission, Plaintiff's loss of the team leader role amounted to nothing more than a loss of limited responsibility. The purpose of the filing team was merely administrative and a way for Cowart to bring order to the process of revising each client's benefit plans to comply with GUST. Plaintiff's "loss" involved nothing more than a change in her titular role and a few responsibilities that accompanied it. She continued performing work on GUST amendments afterwards as part of another filing team, she suffered no loss in pay, she experienced no change in job classification, and there was no effect on her partnership track. App. at 86, 90-91 (Bridges Depo. at 181, 185-86). As a matter of law, Plaintiff's mere loss of some job responsibilities was not a demotion or otherwise an adverse employment action sufficient to establish a *prima facie* case of pregnancy discrimination. *Peterson v. City of Dallas*, No. 04-11034, 2005 U.S. App. LEXIS 3484, at *7 (5th Cir. Feb. 28, 2005) (no adverse employment action where plaintiff lost some job responsibilities, but job position remained otherwise unchanged); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 278 (5th Cir. 2004) (to establish a demotion, an employee must show substantial diminishment in duties, benefits, or compensation.); *Devenport*, 2004 U.S. Dist. LEXIS, at *27 (loss of some job duties is not ultimate employment decision); *Williamson v. Tom Thumb*, No. 3:01-CV-0159-BC, 2001 U.S. Dist. LEXIS 18811, at *10 (N.D. Tex. Nov. 13, 2001) (J. Boyle) (changes to job assignments do not rise to the level of an adverse employment action); *Craven v. Texas Dep't of Criminal Justice-Institutional Div.*, 151 F. Supp. 2d 757, 766-768 (N.D. Tex. 2001)(citing cases from other jurisdictions, Court agreed loss of supervisory responsibility insufficient to constitute adverse employment action).

Even if the Court determines Plaintiff's loss of the filing team leader role was an adverse employment action, Jenkens & Gilchrist had a legitimate, non-discriminatory reason for its actions, namely, the collapse of four teams into three due to the teams' substantial completion of their amendment responsibilities and the ability of the three remaining teams, led by more senior

attorneys, to efficiently supervise the completion of the amendments of the remaining plans. App. at 88-89, 211-13 (Bridges Depo. at 183-184; Cowart Depo. at 146-148). Plaintiff does not challenge this rationale, as evidenced by her admission that she does not know why the Firm decided it only needed three teams instead of four. App. at 90 (Bridges Depo. at 185).

Plaintiff opines Cowart's decision to disband her team was motivated by pregnancy discrimination based *solely* on Johnson's comment to Plaintiff, outside of his presence and several months earlier, that she thought Plaintiff should be removed as a team leader because Plaintiff's morning sickness was causing her to put in fewer hours and she was concerned work would fall through the cracks. App. at 93 (Bridges Depo. at 189). This contention falls flat and is nonsensical. Johnson's comment does not reflect pregnancy animus or pregnancy-based stereotyping; instead, it reflects her legitimate concern whether Plaintiff was in a position to lead a team if she is not performing well and not working the hours required of her, which Plaintiff admits is true. App. at 175 (Bridges Depo. at 296). It also is undisputed that when Plaintiff spoke to Cowart about the comment, he assured her, and kept his word, that he did not intend to remove her as a filing team leader. In fact, she remained a filing team leader for approximately three more months before Cowart collapsed the teams from four to three, a process he initiated, not Johnson. App. at 78-79, 94, 222-23 (Bridges Depo. at 173-74,190; Johnson Depo at 33-34). Cowart did not replace Plaintiff with a new team leader, nor did he create a new team to complete the GUST amendments or later prepare plans compliant with the EGTRAA Amendments. App. at 94, 87 (Bridges Depo. at 190, 182). For Plaintiff's claim to make sense, one would have to believe Cowart imparted more work on the remaining teams *solely* to discriminate against Plaintiff. In sum, Plaintiff's subjective belief that the comment demonstrates pregnancy animus that motivated the disbanding of her filing team is irrelevant. *See, e.g., Williamson,* 2001 U.S. Dist. LEXIS, at *10, n.5 (an employee's subjective

24

belief he was the victim of discrimination does not create an issue of material fact for trial); *Clark v. Southwestern Bell Telephone Co.*, No. CA3:96-CV-2913-BC, 1998 U.S. Dist. LEXIS 7981, at *19 (N.D. Tex. May 27, 1998) (J. Boyle) (plaintiff's subjective belief of discrimination was insufficient to withstand employer's motion for summary judgment).

### 2. *Plaintiff's Premature Delivery*

Plaintiff contends she delivered her baby prematurely because of the stress Johnson caused her with the occasional comments of the previous six months and because of Cowart's actions in the three days prior to her delivery. App. at 112-18 (Bridges Depo. at 212-18).[12] This subjective and unscientific claim fails for several reasons. As an initial matter, the early delivery of a baby is not an adverse employment action because it does not, as it must, involve an employment decision by Jenkens & Gilchrist. *Thompson v. Naphcare, Inc.*, No. 04-60028, 2004 U.S. App. LEXIS 23697, at *14 (5th Cir. Nov. 11, 2004) (unpublished) (to have a tangible employment action, an employer must have made an employment decision). Second, Plaintiff has absolutely no evidence, other than her subjective belief, the Firm caused her early delivery:

> Q.     Do you have any doctor---is there any doctor you're aware of that would say, that has given you a medical opinion that you delivered a baby early because of any action taken by someone at Jenkens & Gilchrist?
> A.     No.
> Q.     Any scientific evidence of any type that you know of?
> A.     No.
> Q.     So---but as you sit here today, other than it being your own subjective belief that you delivered Matthew early because of something that happened at the firm, do you have anything else that suggests that?
> A.     No.

App. at 98-100 (Bridges Depo. at 195-97).

---

[12] "Q: So as I understand it then, the combination of comments that Riva Johnson made about the size of your belly, your clothes, that you waddled and that your - - you had large breasts, combined with Mr. Cowart questioning your commitment to getting work done and giving you a review, it's your contention, that prompted the premature birth of your child? A: Yes."

Even if she could establish the actions of Johnson or Cowart caused her to deliver prematurely, she cannot connect them to pregnancy discrimination. According to Plaintiff, Johnson commented to her about her pajama-like maternity clothes, belly size, waddling, and, once, about her breast size. Johnson's comments about Plaintiff's maternity clothes do not cloak pregnancy animus on their face because they are critical about her *style* of her maternity clothing, not the fact she is pregnant. For that matter, Plaintiff readily acknowledges Johnson offended her with comments about her clothing and appearance before she became pregnant, which establishes Johnson consistently commented about her clothing and appearance throughout her employment. Such consistency, Plaintiff admits, makes her claim of pregnancy animus difficult to justify. App. at 105-106 (Bridges Depo. at 203-204). In the end, Plaintiff concedes she does not know what motivated Johnson to remark that she had a big belly, had larger breasts or waddled when she walked, nor does she explain how such comments reflect discriminatory animus or relate to any adverse employment action. It is merely her subjective belief they do. App. at 107 (Bridges Depo at 205). Plaintiff's subjective beliefs, however, are not competent summary judgment evidence.

Plaintiff fares no better regarding her complaint of Cowart's actions in the three days before her delivery. In the practice group meeting on November 5, 2002 Cowart assigned her a project to work on from home *before* she began her maternity leave on Monday, November 11. The next day, Plaintiff sent Cowart an e-mail informing him that although she would complete as many previously-assigned projects as possible while laying in bed that week, she did not feel comfortable taking any new projects, and she returned the assignment to him. When she returned it, she says he made her feel horrible for doing so, even discussing it with her in front of another associate. It is in making

her feel horrible for returning the project, not in the assignment of it,[13] that Plaintiff contends Cowart exhibited pregnancy animus.  Again, she confesses it is only her subjective belief that his actions resulted from pregnancy animus.  She has no competent summary judgment evidence connecting his actions to such animus.  App. at 110, 115 (Bridges Depo at 209, 215).

Plaintiff's final complaint regarding the three days before her delivery involves the decision of Cowart and Johnson to present her with her performance review before she commenced her maternity leave and the content of the review.  With regard to the timing of the review, Plaintiff contends it was discriminatory because Cowart and Johnson "should have known" the review was not good for her in her condition.  App. at 120, 170 (Bridges Depo. at 221, 291).  It is clear from Plaintiff's testimony her claim lacks any substance:

> Q.    Well, is it your position that the reason that you received the review, that they gave you the review when they did, was to cause you to go into pre-term labor?  Is that the position you're taking in this lawsuit, that that was their goal?
> A.    I don't think that it was their goal, but it was my position that it occurred.
> Q.    I understand that, but I'm just asking, is it your position that they intentionally gave you the review before to cause you to go into pre-term labor?
> A.    No.
> Q.    So your position instead is, they just should have given you special consideration for when they gave the review because of your medical condition?
> A.    Yes.

App. at 170-71 (Bridges Depo. at 291-92).  Thus, Plaintiff's *real* complaint is the absence of special treatment based on her pregnancy, which the PDA clearly does not require.  *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 861 (5th Cir. 2002) (the PDA does not require preferential treatment of pregnant employees); *Urbano*, 138 F.3d at 208 (the PDA does not impose an affirmative obligation on employers to grant preferential treatment to pregnant women).

---

[13]   She concedes there was no discrimination evidenced by the mere assignment of the project because he had assigned her work up until the start of her 2001 medical leave for rhinoplasty as well.  For that matter, others in the practice group who took medical leaves received assignments up to the start of their leaves of absence, too.  App. at 173-74 (Bridges Depo at 294-95).

The undisputed facts establish as a matter of law that neither the timing nor the content of her performance review were the result of pregnancy discrimination. With regard to the timing of the review, Cowart and Johnson gave her the review before her maternity leave for a number of undisputed reasons: because the raw data from the reviews would soon be available to the associates and they did not want her to see the data before she received feedback from them; because she was not going to advance with her class and receive a raise for 2003 they needed to notify her of the decision before she began receiving paychecks while on maternity leave in 2003; and, they wanted her to have time to consider her performance issues while she was on leave, rather than confront her with them immediately upon her return from leave. Plaintiff admits she has no evidence to dispute the veracity of these reasons, except, of course, her subjective belief that the timing must have been the result of pregnancy animus. App. at 119 (Bridges Depo at 220) (Q: And it's just your subjective belief that the fact he went with [the review] early, that that somehow evidences pregnancy discrimination? A: Yes.").

With regard to the content of the review, as set forth at 10-13, *infra*, Plaintiff confirms that during the majority of the review period, September 2001 through July 2002, she was in a funk, the quality of her work and hours were sub-par, she was failing to reach self-made goals and her practice group leader was disappointed in her and "riding" her regarding her hours. She admits the conclusion reached by the majority of her reviewers was that she was not performing at the level one would expect of an attorney with her years of experience. She concedes this conclusion and other criticisms of her performance were fair, which is not surprising considering her own description of her performance. She also admits those with whom she worked the most closely and to whom she ascribes no discriminatory animus, Turley and John Kober, were more critical of her performance that Cowart and Johnson. App. at 140-152, 154-55 (Bridges Depo. at 241-47, 249-53, 257, 259-60).

Plaintiff's self evaluation score of 2.71, which was lower that the average 2.93 score of her reviewers, underscores the fairness of her review. App. at 152 (Bridges Depo. at 257). It is simply impossible to conceive how a reasonable juror could digest these facts and conclude Plaintiff was the victim of pregnancy discrimination, an impossibility Plaintiff concedes:

> Q.    So in light of the reviews, do you still contend that the content of your performance review is the result of some discriminatory animus on the basis of pregnancy?
> A.    Yes.
> Q.    How do you take that position based on the uniformity of these reviews? What facts or circumstances suggest to you that the review process was tainted with pregnancy discriminatory animus?
> A.    I can't give you an answer right now.
> Q:    Would you agree that to the outside person looking at this process, it would be hard to see that there was any discriminatory animus at play here, agreed?
> A:    Yes.

App. at 152-53 (Bridges Depo. at 257-258).

In summary, Plaintiff simply cannot demonstrate with competent summary judgment evidence that the premature delivery of her baby is an adverse employment action, that it resulted from the actions of Jenkens & Gilchrist, or that the Firm's actions evidence pregnancy discrimination.

3.    *Plaintiff's Constructive Discharge Claim*

Regardless of whether Plaintiff claims she quit her job at the Firm as a result of pre- or post-pregnancy events or a combination of same, she cannot prevail on her constructive discharge claim. At some point during Plaintiff's maternity leave, she decided to return to Jenkens & Gilchrist part-time *solely* to provide her with a six-figure income until she could find another job. She then negotiated a favorable part-time arrangement with Cowart and Johnson that allowed her to return to work at the pay she required and on her preferred terms. During the first two days under this new arrangement, she felt comfortable with the arrangement and believed she would remain at the Firm

for the foreseeable future, but she changed her mind conclusively on the third day when Cowart e-mailed her of his decision not to record or bill her time on a project and when Johnson remarked that Plaintiff was partially to blame for the e-mail confrontation because of a "snippy tone." *See infra* pp. 14-15.

Under Title VII, a resignation is actionable only where it amounts to a constructive discharge. Demonstrating a constructive discharge imposes a high burden, and to carry this burden, Plaintiff must show that a reasonable person in her shoes would have felt compelled to resign. *Robinson v. Waste Mgmt. of Texas*, No. 04-40293, 2004 U.S. App. LEXIS 26808, at *5 (5th Cir. Dec. 23, 2004); *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295, 301 (5th Cir. 2001). Courts consider the following factors, commonly referred to as the *"Barrow* factors" after its namesake case, when deciding whether a reasonable person would feel compelled to resign: (1) demotion; (2) reduction in salary; (3) substantial reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor[14]; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. *Donaldson v. Burlington Indus., Inc.*, No. 03-51362, 2004 U.S. App. LEXIS 18354, at **6-7 (5th Cir. Aug. 31, 2004) (citing *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)). The standard Plaintiff must satisfy is an objective one; Plaintiff's subjective state of mind is irrelevant. *Robinson*, 2004 U.S. App. LEXIS at **4-5. Importantly, proof of constructive discharge requires a greater degree of harassment than the proof required for a hostile environment claim. *Haley*, 391 F.3d at 650. Discrimination alone, without aggravating factors, is insufficient for a claim

---

[14] This factor is typically applied in age discrimination cases. *See Haley v. Alliance Compressor LLC*, 391 F.3d 644, 650 n.1 (5th Cir. 2004).

of constructive discharge. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.), *cert denied*, 534 U.S. 817 (2001).

Even before examining the *Barrow* factors, it is clear the Firm did not constructively discharge Plaintiff by anything it did before her maternity leave. The definition of constructive discharge assumes a "discharge," which is a requirement of the *prima facie* case; without a discharge, the existence of discriminatory purpose or pretext is completely irrelevant. *Barrow*, 10 F.3d at 297. As a matter of law, the Firm could not have constructively discharged Plaintiff by its actions prior to her maternity leave if she elected to return to work indefinitely on terms she negotiated after the maternity leave ended. Had she been constructively discharged, she simply would have quit while on maternity leave.

Similarly, Plaintiff's return to the Firm on a part-time basis cannot establish a constructive discharge under the *Barrow* factors. Her initiation and active negotiation of a favorable part-time arrangement with a reduced billable hour requirement and a $100,000 salary, along with the Firm's agreement that she, unlike other associates, could refuse work from shareholders, belies any claim she suffered a Firm-imposed demotion, reduction in salary or job responsibilities, a reassignment to menial or degrading work, or reassignment to a younger supervisor. Nor does Plaintiff have any evidence the Firm offered her an early retirement on less favorable terms than others. Additionally, it is undisputed the decision to return to work part-time was hers alone and was the result of a process she initiated. It is further undisputed Plaintiff could and would have returned to the Firm full-time had she not been satisfied with the terms of a part-time arrangement.

With regard to the events of February 12, 2003 – the events she claims prompted her to quit – they would not have made a reasonable person feel compelled to resign. Cowart's refusal to allow her to bill or record a few hours of time on a work project because he was dissatisfied with her

31

performance, and Johnson's response that included a special, unprecedented concession that Plaintiff would no longer have to work with Cowart for the foreseeable future, do not establish they badgered, harassed, or humiliated Plaintiff to encourage her resignation. *See Garza v. Fuston*, No. 3:01-CV-1233-N, 2003 U.S. Dist. LEXIS 17134, at \*12 (N.D. Tex. Sept. 29, 2003) (the mere fact an employee experiences pressure or feels nitpicked does not rise to the level necessary to establish working conditions so intolerable they result in a constructive discharge). Their actions certainly are not the type of "aggravating factors" envisioned by the Fifth Circuit, especially in light of Plaintiff's admissions they were not the result of discriminatory animus,[15] and that throughout her employment, shareholders wrote-off her time and the time of other associates. App. at 37, 41-44 (Bridges Depo. at 91, 105-106, 110-11); *compare Thompson*, 2004 U.S. App. LEXIS 23697, at \*\*20-22 (allegations of five instances of putative sexual harassment, several instances where Plaintiff was more harshly reprimanded by supervisor than she believed warranted, and overly strict supervision by supervisor were not of "sufficient magnitude" to create intolerable work environment); *Gage v. Nat'l Util. Co./Nuco,* No. 4:00CV-1672-BE, 2001 U.S. Dist. LEXIS 18213, at \*\*15-16, 20 (N.D. Tex. Nov. 6, 2001)(ongoing harassment by supervisor, escalated teasing by co-workers, inaction of management to complaints, and unfulfilled threats to move plaintiff back to shop area and cut her pay were insufficient to establish badgering, harassment, or humiliation calculated to encourage resignation). It simply defies logic for Plaintiff to argue their actions constitute badgering or harassment calculated to prompt her resignation when it was Cowart and Johnson who agreed to her favorable part-time arrangement only a few weeks earlier. Even Plaintiff agrees these facts make her claim untenable.

---

[15] "Q: Were [those actions] motivated by pregnancy discrimination? A: No." App. at 44 (Bridges Depo. at 111).

App. at 111 (Bridges Depo. at 211).[16] For that matter, it makes no sense for Johnson to offer Plaintiff the opportunity to avoid working with Cowart – an action that made her extremely happy[17] – if her goal was to force Plaintiff to resign or to make her work life intolerable. Instead, she would have done nothing in response to Plaintiff's complaint or taken other steps to induce Plaintiff to quit.

Third, Plaintiff's failure to quit in June 2002 after Ms. Johnson's allegedly discriminatory comments, her failure to quit after the events she alleges caused her pre-term delivery, her failure to quit after the events of February 12, 2003 and her decision to remain at the firm until May 2003 after she secured a new job, demonstrate, *ipso facto*, that her working conditions at the Firm were not so intolerable that a reasonable person would resign. Plaintiff's actions and words demonstrate conclusively that the amount of pay she received at Jenkens & Gilchrist made her working conditions subjectively and objectively tolerable. It is disingenuous for her to argue her conditions were objectively intolerable, when she was only willing to leave for a job that paid her the same or more money.

Addressing a factually similar circumstance in *Donaldson v. Burlington Indust., Inc.*, No. 03-51362, 2004 U.S. App. LEXIS 18354, at **7-8 (5th Cir. Aug. 31, 2004), the Fifth Circuit agreed, as a matter of law, the plaintiff was not constructively discharged. In that case, the plaintiff alleged, *inter alia*, she was constructively discharged based on a heated meeting between her and her supervisors wherein they told her they would "squash her like a bug" if she continued sending offensive memos. Despite the plaintiff's contention she was in a fragile emotional state, she did not resign after the

---

[16] For that matter, Johnson's action to remove Plaintiff from working with Cowart on future projects, as a matter of law, demonstrates that it was unreasonable for Plaintiff to quit based on Cowart's actions. *See Hockman v. Westward Communications, LLC*, No, 03-41620, 2004 U.S. App. LEXIS 27066, at **34-36 (5th Cir. Dec. 22, 2004) (unpublished) (employer's prompt remedial measure of separating plaintiff from alleged harasser was "fatal" to constructive discharge claim); *Harvill v. Westward Communications, LLC*, 311 F. Supp. 2d 573, 586 (E.D. Tex. 2004) (court found no constructive discharge where employer separated plaintiff from harasser because employer instituted prompt remedial measures reasonably calculated to end harassment).

[17] App. at 200 (Duarte Depo. at 58).

meeting, and instead, waited several months to do so. According to the Court, "because she did not resign until well after the meeting of which she complains, it would be unreasonable to find that the meeting, standing alone, caused [her] to feel compelled to resign." *Id.* Thus, because the plaintiff remained employed after she experienced treatment she alleged would compel a reasonable person to resign, she was not, as a matter of law, constructively discharged. *Id.* at **9-10. In light of the strict standard a plaintiff must meet to prevail on a constructive discharge claim, Texas courts routinely refuse to find a constructive discharge when the plaintiff acts unreasonably. *See, e.g., Stewart v. Dep't of Health and Hosp.*, No. 04-30409, 2004 U.S. App. LEXIS 24748, at **9-10 (5th Cir. Dec. 1, 2004) (unpublished) (finding no constructive discharge where plaintiff voluntarily chose to accept favorable severance package negotiated by her private counsel); *Reznick v. Associated Orthopedics & Sports Med., P.A.*, No. 03-41497, 2004 U.S. App. LEXIS 14318, at *18 (5th Cir. July 13, 2004) (unpublished) (a constructive discharge claim cannot be based on facts that are remote in time); *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562 (5th Cir. 2003) (finding no constructive discharge where plaintiff alleged constructive discharge based on reassignment but then remained employed for 4 ½ month period between reassignment and resignation); *Clark v. Wise County Sheriff's Dep't*, No. 4:03-CV-1003-A, 2004 U.S. Dist. LEXIS 10985, at **12-13 (N.D. Tex. May 20, 2004) (finding no constructive discharge where, following suspension without pay, plaintiff returned to work and then later resigned). Simply put, Plaintiff's actions are inconsistent with a finding her work conditions were so intolerable a reasonable person would feel compelled to resign.

Plaintiff's claim also lacks merit because, to the extent she complains about pre- or post-maternity leave events, it is undisputed she failed to avail herself of the protections of Jenkens & Gilchrist's anti-harassment policy. It is mandatory precedent in this Circuit that a reasonable employee who genuinely believes her working conditions are upsetting to the point of being

34

intolerable will attempt resolution of her concerns before choosing to quit, and *must* do so if the employer implements a policy for reporting such conditions. *Haley*, 391 F.3d at 652. Unlike a reasonable person, before Plaintiff decided to quit and separate her employment, she *did not* follow the reporting procedure contained in the Firm's anti-harassment policy by reporting behavior she considered inappropriate to the proper persons, despite the fact she received training on the policy. As such, she acted unreasonably as a matter of law and cannot prevail on her constructive discharge claim. *See, e.g., Robinson* 2004 U.S. App. LEXIS 26808, at *7 (affirming summary judgment on constructive discharge claim where plaintiff failed to lodge complaints about supervisor, because a reasonable employee would have done so); *Thompson* 2004 U.S. App. LEXIS 23697, at **21-22 ("We are also satisfied that an employee who resigns without affording the employer a reasonable opportunity to address concerns has not been constructively discharged.").

Plaintiff excuses her failure to report her concerns because of Johnson's status as a shareholder and member of the Firm's board of directors. This Court has previously rejected such an excuse as unreasonable as a matter of law. *See Taylor v. Nickels & Dimes, Inc.*, No. 3:00-CV-1461-L, 2002 U.S. Dist. LEXIS 14560, at **18-19 (N.D. Tex. Aug. 7, 2002)(finding plaintiff acted unreasonably when she failed to report harassment simply because she believed management would not do anything about it). In sum, Plaintiff's failure to report inappropriate behavior in accordance with the policy she received and on which she received training establishes as a matter of law she acted unreasonably and, therefore, was not constructively discharged.

### V.

### CONCLUSION

Plaintiff's claims are time-barred, which makes it unnecessary for the Court to address the merits of Plaintiff's claims. Nevertheless, for the reasons stated above, Jenkens & Gilchrist

respectfully requests the Court grant summary judgment on all claims brought by Kandice Bridges

against it, and deny all relief requested in connection with those claims; that Jenkens & Gilchrist be

awarded judgment for all costs of this proceeding; and that Jenkens & Gilchrist be awarded

reasonable and necessary attorneys' fees, expenses, and such other and further relief, general or

special, at law or in equity, as the Court may deem just and proper.


Respectfully submitted,

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**


_____
Bryant S. McFall
Texas Bar No. 00784556
Alicia Sienne Voltmer
Texas Bar No. 00797605
700 Preston Commons
8117 Preston Road
Dallas, Texas 75225
Telephone: (214) 987-3800
Facsimile: (214) 987-3927

**ATTORNEYS FOR DEFENDANT**


## CERTIFICATE OF SERVICE

This is to certify that on this 25th day of March 2005, a true and correct copy of the above and foregoing was forwarded via certified mail, return receipt requested, to all counsel of record:


_____